IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

KYMBERLI GARDNER                                                    PLAINTIFF

v.                                            CAUSE NO. 1:15CV423-LG-RHW

CLC OF PASCAGOULA, LLC, d/b/a
PLAZA COMMUNITY LIVING CENTER                           DEFENDANT

MEMORANDUM OPINION AND ORDER
GRANTING MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion for Summary Judgment [28], filed by

Defendant CLC of Pascagoula, LLC, d/b/a Plaza Community Living Center in this

employment discrimination case.  The Motion has been supplemented [50], and

Plaintiff has responded to the supplementation.  Additionally, Plaintiff Kymberli

Gardner has filed two motions to strike the affidavit [32] and testimony [34] of

Brandy Gregg.  Defendant CLC has also filed a motion [45] to strike Kymberli

Gardner's affidavit in support of her response to the summary judgment motion.

Each motion has been fully briefed.   After due consideration, the Court finds that

there is no question of material fact for the jury and that Defendant is entitled to

judgment as a matter of law.

BACKGROUND

Plaintiff Gardner began working at Plaza Community Living Center ("CLC")

as a Certified Nursing Assistant in April 2012.  She alleges that an elderly white

male resident at the facility, J.S., created a hostile work environment by sexually

and racially harassing her and other employees.  Gardner asserts that when black

female employees complained about J.S.'s behavior, they were told that it was their

job to take care of J.S. and they should "just put their big girl panties on."
According to Gardner, when white employees complained about a black resident,
the resident was moved from the facility. (Am. Compl. 3, ECF No. 20). Gardner
asserts that on October 6, 2014, J.S. attempted to grope her. When Gardner told
J.S. "no," he punched her in the chest. (*Id*. at 2). She was forced to take leave and
worker's compensation as a result. (*Id*.). She alleges that when she returned to
work five months later, she was terminated because of the incident with J.S. (*Id*.).

Gardner filed a charge with the Equal Employment Opportunity
Commission, in which she alleged she was subjected to race and sex discrimination,
a hostile work environment, and retaliation. (Compl. Ex. A, ECF No. 1-1). The
EEOC issued a Dismissal and Notice of Rights letter six months later. (Compl. Ex.
B, ECF No. 1-2). This lawsuit followed.

Gardner does not explicitly set out her Title VII claims in the Amended
Complaint, but the allegations are generally consistent with her EEOC charge of
discrimination. Additionally, she brings state law claims "under Mississippi's
doctrine of wrongful termination in violation of public policy established under
*McArn v. Allied Bruce-Terminix*," gross negligence, negligent and intentional
infliction of emotional distress, outrage, assault, and negligent supervision and
retention. (Am. Compl. 4-5, ECF No. 20). CLC's summary judgment motion argues
for dismissal of all claims.

DISCUSSION

Before moving to analysis of the substantive claims, there are three
preliminary matters affecting the evidence the Court may consider. Gardner

2

requests that the Court strike the affidavit and certain testimony of Brandy Gregg, CLC's Director of Nursing, and CLC requests that the Court strike portions of Gardner's affidavit.

Motion to Strike Affidavit of Brandy Gregg

Gardner seeks to strike the affidavit of Brandy Gregg, which was submitted by CLC in support of its Motion for Summary Judgment as Exhibit L. (ECF No. 28-12). Gregg is the Director of Nursing at CLC. Gardner contends that Gregg's affidavit is self-serving, based wholly on inadmissible hearsay, and purports to provide medical opinions which Gregg is unqualified to give.

The affidavit is short. It states that Gregg reviewed CLC's business records concerning J.S., and that these records are maintained by CLC in the ordinary course of its regularly conducted business activities. J.S. resided at CLC from March 7, 2006 to October 7, 2014, when he was transferred to Singing River Hospital psychiatric unit for evaluation. Gregg summarizes J.S.'s diagnosis history as including dementia, traumatic brain injury, personality disorder with aggressive behavior, Parkinson's Disease, and a number of additional illnesses. She concludes that "J.S. was unable to care for himself, and was dependent on the employees of Plaza CLC for his needs." (Def. Mot. Ex. L 1 (¶3), ECF No. 28-12).

The Court discerns no impermissible medical opinion in the affidavit. Gregg's recitation of J.S.'s medical condition was based on review of CLC's business records. As Director of Nursing, Gregg is competent to testify about CLC's records concerning J.S. *See Rust v. Bank of Am., N.A.*, 573 F. App'x 343, 345 (5th Cir. 2014); *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980). Further, the

business records are in the nature of hospital records, which are not inadmissible hearsay.

> Rule 803(6) provides a hearsay exception for records kept in the course of *any* regularly conducted business activity, which would include hospitals. *See* Advisory Committee's Notes on Federal Rule of Evidence 803(6), 28 U.S.C. App., p. 723; *Ricciardi v. Children's Hospital Medical Center,* 811 F.2d 18, 22 (1st Cir.1987). The admissibility of hospital records under this exception is supported by the presumption of reliability that attaches to statements relating to treatment and medical history in such records. *Ricciardi,* 811 F.2d at 22.

*Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991). The Motion to Strike Brandy Gregg's affidavit will be denied.

<u>Motion to Strike Certain Testimony of Brandy Gregg</u>

Gardner asserts that Gregg's deposition testimony regarding her understanding of the reasons for Gardner's termination is inadmissible hearsay. Gardner contends that Gregg was not the person who terminated her, nor was Gregg involved in the termination decision, and therefore she could have no personal knowledge of the decision.

As Director of Nursing, and the person who conducted the investigation into the events surrounding the J.S. incident, Gregg's personal knowledge of the reasons for Gardner's termination is readily apparent. "Personal knowledge may be demonstrated by showing that the facts stated reasonably fall within the sphere of responsibility of the affiant as a corporate employee." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citations and quotation marks omitted). Gregg's "official title alone is enough to indicate the

basis of personal knowledge." *Rutledge v. Liab. Ins. Indus.,* 487 F. Supp. 5, 7 (W.D. La. 1979). The Motion to Strike Brandy Gregg's testimony will be denied.

<u>Motion to Strike Portions of Affidavit of Plaintiff Kymberli Gardner</u>

CLC seeks to have portions of Gardner's affidavit [ECF No. 39] stricken as speculative. The Court agrees that certain of Gardner's statements are speculative because they concern another person's thoughts or motivations. Thus, the objected-to statements in paragraphs 8, 12, and 17 are disregarded. The portion of paragraph 29 that relates facts is admissible and will be considered. The reasons or motivation that Gardner ascribes to CLC in paragraph 29 are not facts within Gardner's personal knowledge, and therefore will be disregarded.

Gardner's statements in paragraphs 22, 23, 26, and 27, concerning how she was made to feel by CLC's actions, are admissible. Those are matters within her personal knowledge and may be relevant to the hostile work environment inquiry. CLC's argument that Gardner's affidavit statements differ from her deposition testimony is not well taken. Gardner did testify regarding the negative impact of CLC's actions, and her affidavit supplements, rather than contradicts that testimony. *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). The Motion to Strike is therefore granted in part and denied in part. The objected-to portions of Gardner's affidavit will be considered to the extent set out above.

ANALYSIS OF SUBSTANTIVE CLAIMS

## I. Hostile Work Environment

Gardner claims that she was subjected to unwelcome sexual harassment by J.S., which created a hostile work environment. To prevail on her hostile work

environment claim, Gardner must prove that: (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) such harassment was based on gender or race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

> We determine whether a hostile work environment exists using a totality-of-the-circumstances test that focuses on the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance.

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347 (5th Cir. 2007) (ellipsis in original) (internal citation and quotation marks omitted).  A plaintiff "must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).  Title VII is intended only to prohibit and prevent conduct "that is so severe [or] pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  Title VII's overall goal of equality is not served if a claim can be maintained solely based on conduct that wounds or offends, but does not hinder an employee's performance.  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996).  It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

CLC argues that Gardner's hostile work environment claim should be dismissed because the facts of this case do not meet the standard for such a claim. In support of its argument, CLC refers primarily to the testimony of Gardner and Nurse Toche, LPN, who was in J.S.'s room during some of the events at issue here. The testimony and CLC's argument seem to go to the fourth and fifth elements of a hostile work environment claim – whether the harassment affected a term, condition, or privilege of employment; and whether CLC knew of the harassment and failed to take prompt remedial action. Gardner's response also focuses on these elements.

a. *Gardner's Testimony*

Gardner testified that she had been extensively trained to deal with physically combative and sexually aggressive patients, and as a CNA she dealt with such patients "all the time." (Gardner Dep. 21, 31-32, ECF No. 28-10). Gardner agreed that it was not unusual for a physically combative or sexually aggressive patient to reside in a nursing home. She testified that J.S. was a resident of CLC when she began working there, although she was not initially assigned to work with him. (*Id.* at 41-42). Nevertheless, Gardner knew J.S. and had observed his inappropriate physical and verbally abusive behavior. (*Id.* at 54-55). Gardner did not know if J.S. had a diagnosis of dementia. "We were always told he had – he would have a [urinary tract infection] or he would just be combative. We never was told if he had dementia or not." (*Id.* at 58).

When Gardner complained about J.S.'s behavior to Brandy Gregg, Gregg would laugh. (Gardner Aff. 2 (¶12), ECF No. 39). Gardner also spoke to Teri Reynolds,

the administrator, about J.S.  Reynolds told Gardner it was just J.S.'s age, and Gardner "needed to put [her] big girl panties on and go back to work."  (*Id.* (¶13)). "The supervisors would respond that we were supposed to do our job and to just chart his behavior.  They did nothing based on the charting."  (*Id.* (¶14)).

Regarding the specific events leading to her injury, Gardner testified that while she was dressing J.S. on the morning of October 6, 2014, he attempted to grope her breast and made sexually explicit comments.  (Gardner Dep. 67, ECF No. 28-10). When she moved away, J.S. punched her on her left side.  (*Id.*).  She put him back in his bed and left the room to get help.  (*Id.* at 68).  She located another CNA, Janice Watkins, who helped Gardner get J.S. out of bed.  (*Id.* at 68-69).  Once again, J.S. struck Gardner in her side.  (*Id.* at 69).  Gardner, feeling that J.S. was getting out of control, elicited additional assistance from LPN Judy Toche.  (*Id.* at 70). Gardner moved the wheelchair close to J.S. so that Watkins and Toche could help him into it.  After he was in the chair, he punched Gardner once again in her left side.  (*Id.* at 71).  Gardner testified that she asked Toche to switch patients, because she was "not going back in there and get hit again."  (*Id.*).  However, Toche declined the request.

Gardner told Administrator Teri Reynolds she "could not continue to be harassed and assaulted by J.S."  (Gardner Aff. 3 (¶21), ECF No. 39).  Reynolds replied that Gardner "could not refuse to take care of J.S. and she was not going to move another nurse to take care of him."  (*Id.*).  Gardner was sent home.  (Gardner Dep. 73, ECF No. 28-10).  Before Gardner left, Gregg asked her if her side was hurting.  (*Id.*).  Gardner told Gregg "it's not hurting right now, it stings.  I said it's a

little – you know, like a sting." (*Id*.).  Gardner was out on worker's compensation
leave from October to January 2, 2015.  (*Id*. at 75).  She was terminated on March 5,
2015.  (Def. Ex. F, ECF No. 34-1).

> b.  *Watkins' Testimony*

CNA Janice Watkins testified that prior to the J.S. incident, she was aware that
J.S.'s behavior was consistently physically aggressive and sexually inappropriate:
"if you're going to do any kind of patient care, he was always touching you
inappropriately." (Watkins Dep. 9-10, ECF No. 35-1).   His behavior was reported
"to the nurses all the time."  (*Id*. at 11).  Watkins stated that J.S. "might have had
dementia, but every day it was something he was constantly doing."  (*Id*. at 29).
J.S. was placed on a "behavior program" for his inappropriate touching.  (*Id*. at 12).
Watkins did not observe any difference in how J.S. acted toward a white nurse
versus a black nurse: "[b]asically everybody that went in that room, he had some
kind of react to them."  (*Id*. at 19).  Watkins agreed that J.S. was more "touchy-feely
and that sort of stuff" than all the other residents.  (*Id*. at 12).  Watkins testified
that Teri Reynolds told the staff to do their job and just keep track of what was
going on with J.S.  (*Id*. at 14).  "We had to go with the flow."  (*Id*.).

In regard to the Gardner incident, Watkins testified that she had been walking
past J.S.'s door when she heard him "[u]sing profanity and calling [Gardner] out of
her name and touching and stuff.  So I went in there."  (*Id*. at 16).  She saw J.S. hit
Gardner in her stomach area.  (*Id*.).  Gardner's reaction was to jump back, with
both hands in the air.  (*Id*. at 17).  Watkins testified in her deposition that she did
not see Gardner try to hit J.S. in response.  (*Id*. at 17-18).  In her witness statement

for the investigation, Watkins stated that after J.S. hit Gardner, Gardner "[went] up with her hand as if she was going to hit pt. but didn't hit pt. at all." (Def. Ex. E 2, ECF No. 28-5). Watkins then heard Gardner say she was not doing anything else for J.S. and left the room, telling the nurse that "he is your problem now." (*Id.*).

> ### c. *Toche's Testimony*

LPN Judy Toche testified that J.S. "had periods of time when he would cuss, he would hit, be uncooperative, that's about it." (Toche Dep. 10, ECF No. 35-2). She did not think he was more aggressive than the typical resident. (*Id.*). Several nurses and aides had told her that J.S. made sexual comments. (*Id.* at 11). Toche spoke to Brandy Gregg about J.S.'s behavior "several times." (*Id.* at 12). Gregg responded by telling Toche to medicate J.S., or she went into J.S's room to talk to him. (*Id.* at 12-13).

Toche testified that on the day of the incident, Gardner came to get her to help with J.S. because he was being uncooperative and fighting. (*Id.* at 15). Toche saw J.S. hit Gardner once or twice, but did not hear him say anything sexual – only "leave me alone." (*Id.* at 15-17). Toche saw Gardner try to hit J.S. (*Id.* at 21). According to her notes, Toche saw Gardner swing her arm over J.S.'s head "briefly scraping top of head." (Def. Ex. E 6, ECF No. 28-5). After Watkins helped get J.S. in the wheelchair, Gardner told Toche that she wasn't taking care of J.S., that he was Toche's responsibility. (*Id.*; Toche Dep. 25, 33). Toche told Gardner "no, he was her patient, that she needed to take care of him,  And she refused." (Toche Dep. 33). Toche was Gardner's supervisor that day, and so she considered Gardner's

refusal to take care of J.S. to be insubordination. (*Id.*). She reported the insubordination and Gardner's attempt to hit J.S. to Brandy Gregg. (*Id.* at 34).

### d. Other Evidence

Gardner provided an affidavit stating that although it was common for a resident to be sexually inappropriate or combative, it was uncommon for a resident to sexually assault and batter the nurses. (Gardner Aff. 1 (¶7), ECF No. 39). Unlike J.S., other patients could be easily redirected from inappropriate behavior. (*Id.* at 2 (¶15)). Gardner also states that J.S. would "refer to me and the other black CNA's as 'niggers' and other racially derogatory terms, without reprimand from the supervisors." (*Id.* (¶10)).

Gardner provided deposition testimony of CNA Sharon Woodland. Woodland testified that "when you wouldn't sometimes let him touch or stuff [J.S.] would get combative and try to fight you and hit you." (Woodland Dep. 9, ECF No. 35-5). J.S. was this way "[e]ver since I knew him, you know, ever since I came in contact with him." (*Id.* at 10). Woodland stated that Brandy Gregg knew about J.S.'s behavior, and Gregg would "check[ ] for UTIs and stuff like that." (*Id.* at 13). UTI's "could affect you by being, like, just – they're not in their right mind, they talk crazy stuff." (*Id.*). When J.S. tried to touch Woodland inappropriately, she would get away from him and get help from a nurse to redirect him. "But he gave us trouble, he really did." (*Id.* at 16). She agreed that J.S. was more aggressive and more sexually inappropriate than other residents. (*Id.* at 9, 19).

Gardner also provided the deposition testimony of Melissa Riley, who appears to be a CNA. She stated that J.S. was at the facility for about three years, and was

combative and "touchy-feely" the entire time.  (Riley Dep. 18-19, ECF No. 35-6).

J.S. would "get mad and cuss" when she tried to redirect him from groping her or

making sexual comments.  (*Id*. at 23-24).  Riley told her supervisors about the

incidents, but it seemed they did nothing about it.  (*Id*. at 24).  Riley stated that

when J.S. acted inappropriately, she could usually "talk to him and he'll calm down,

you know, or tell him – give him something sweet to eat or something like that and

he would be fine.  But you can go back in, like 10 minutes later and it's all over

again."  (*Id*.).  When asked if J.S. had dementia, Riley responded "I think so, yes."

(*Id*.).

>       e.   *Analysis*

There is guidance for determining whether the evidence identified by the parties

supports a claim of a hostile work environment.  The Fifth Circuit considered

hostile work environment claims made by an employee caring for a disabled elderly

patient in *Cain v. Blackwell*, 246 F.3d 758 (5th Cir. 2001), and again in *E.E.O.C. v.*

*Nexion Health at Broadway, Inc.*, 199 F. App'x 351 (5th Cir. 2006).  The court

affirmed summary judgment against the employee in both cases, but stressed that

the unique, specific circumstances of the employee's work must be considered in

analyzing such a claim. *Cain*, 246 F.3d at 760; *Nexion*, 199 F. App'x at 353.  As the

court stated in *Nexion*:

> *Cain* does not establish a bright-line rule that employees who care for
> disabled, elderly patients can never succeed on a title VII claim.  The
> specific circumstances of each harassment claim must be judged to
> determine whether a reasonable person would find the work
> environment hostile or abusive. . . .  That said, we find the *Cain* court's
> discussion of the unique circumstances involved in caring for mentally

diseased elderly patients to be particularly persuasive, and our
reasoning in *Cain* guides our decision here.

199 F. App'x at 353.

The *Nexion* court considered the severity and frequency of the conduct.  At
issue were "highly discriminatory" comments heard by the CNA "three to four times
a week over a number of months."  *Id.*  The patient physically threatened the CNA,
but there was no actual physical component to the harassment; "it consisted only of
offensive utterances, although those utterances were quite offensive."  *Id.* at 352,
354.  The court concluded that the harassment did not objectively interfere with the
plaintiff's work performance or undermine his workplace competence.  The "unique
aspect of [the plaintiff's] line of employment" -- as a CNA in a nursing home -- was
"a vital consideration."   *Id.*

> He worked in a place where most of the people around him were often
> unable to control what they said or did.  It is objectively unreasonable
> for an employee in such a workplace to perceive a racially hostile work
> environment based solely on statements made by those who are
> mentally impaired.

*Id.* at 354.  As the court found that the work environment was not objectively
hostile or abusive, no rational trier of fact could have held Nexion liable for a hostile
work environment.  *Id.*

The *Cain* court's hostile work environment discussion describes similar
working circumstances:

> As a [home health] employee, Cain's daily routine included dealing
> with the victims of [Alzheimer's and Parkinson's] and their particular
> failings.  In this context, Marcus's improper requests and tasteless
> remarks can not form the basis of a justiciable claim for sexual
> harassment.  We note that Cain never alleged any physical conduct
> that made her feel threatened, nor did she accept Advanced's offer of

13

reassignment, relieving her of the responsibility of care-taking for
Marcus.

*Cain*, 246 F.3d at 760.

In a case from district court of Massachusetts, a respiratory therapist was
terminated after she slapped a patient when she noticed him looking up her blouse.
*Ligenza v. Genesis Health Ventures of Mass., Inc.*, 995 F. Supp. 226, 229 (D. Mass.
1998). The patient was sixty-nine years old, depressed and bedridden, and "made
inappropriate, often sexual, comments to female staff workers." *Id*. at 231.

> Everybody who came in contact with the Patient from the day he
> arrived was aware of his problems. His inappropriate behavior was
> consistently noted and addressed by Genesis in a professional fashion.
> There is simply no evidence that Genesis had any knowledge of the
> alleged effect of the Patient's behavior on Plaintiff, beyond what would
> reasonably be expected in a nursing home.

*Id*. The court concluded that the respiratory therapist had not shown evidence of
an actionable hostile work environment claim.

A district court in Illinois examined a hostile work environment claim in
which a housekeeper in a nursing home was not only verbally threatened and
harassed, but also subjected to unwanted touching by a patient. *Pickett v. Sheridan
Health Care Ctr.*, No. 07C1722, 2008 WL 719224, at *4 (N.D. Ill. Mar. 14, 2008).
The court stated that it was "reluctant, given the context of a nursing home
providing care for residents with mental illnesses, to conclude that three instances
of inappropriate resident conduct over eight months are sufficiently severe or
pervasive." *Id*. The plaintiff complained about the conduct, and the defendant
promptly took appropriate steps to correct and prevent further incidents. *Id*. at *4-
5.

Finally, the Tenth Circuit Court of Appeals examined a hostile work environment claim that arose when a care center resident sexually harassed and eventually assaulted a caregiver. *Aguiar v. Bartlesville Care Ctr.*, No. 10-5002, 2011 WL 1461541 (10th Cir. Apr. 18, 2011).   The court observed that the resident was able to ambulate throughout the care center and was involved in domestic abuse criminal proceedings.   The resident's disabilities were physical; he had no mental diseases and was able to discuss his inappropriate behavior with the care center staff.   However, the resident was somewhat obsessed with the plaintiff, insisting that she treat him and visit him when he desired.   Eventually he became angry, located her in a hallway and shoved a medicine cart into her. *Aguiar*, 2011 WL 1461541, at *4.   The court found that these facts allowed the hostile work environment claim to survive summary judgment. *Id.* at *5.   The court distinguished *Cain* by noting that 1) the resident was suffering from physical disabilities rather than Alzheimer's and Parkinson diseases; 2) the caregiver plaintiff did not have knowledge of the facts regarding the resident's domestic abuse history; and 3) the resident's behavior was more egregious, as it involved both physical and verbal harassment. *Id.*

In this case, Gardner's working conditions subjected her to verbal insults and harassment from mentally diseased patients such as J.S.   She was also subject to physically threatening or humiliating conduct when J.S. groped her on a number of occasions and hit her three times on the day in question.[1]   However, it is not clear to

---

[1]   There is a dispute regarding how severe the blows were.   Gardner told Gregg that she was not hurt, and did not have any pain or marks.   According to Gregg, "[Gardner] even used her own fist to strike her own ribcage on the left to

the Court that the harassing comments and attempts to grope and hit are beyond what a person in Gardner's position should expect of patients in a nursing home such that CLC would be liable for creating a hostile work environment. The Fifth Circuit has indicated that the behavior exhibited by nursing home patients suffering from dementia or other mental diseases can be expected to be outside ordinary social boundaries; it is the reason they reside in such facilities. The court's statement that there is no "bright-line rule that employees who care for disabled, elderly patients can never succeed on a title VII claim" indicates that the default is no viable title VII claim in such situations. Instead, a plaintiff must show unusually egregious working conditions to establish that a reasonable person would find the work environment hostile or abusive.

The verbal harassment at issue here is similar to that in *Cain* and *Nexion*, which the Fifth Circuit found insufficient to support a hostile work environment claim. The more difficult issue is whether CLC should be liable for failing to control J.S.'s physical conduct. The rationale of *Cain* and *Nexion* seems applicable in that context as well. It cannot be unreasonable for an employee trained to handle combative, sexually aggressive patients to actually encounter a combative, sexually aggressive patient. Gardner agreed to work with elderly, mentally diseased patients such as J.S., who could be expected to act out in normally unacceptable ways. There is no suggestion that Gardner was a special target of J.S.'s attention;

---

demonstrate how J.S. had hit her." (Def. Ex. E 3, ECF No. 28-5). Gardner testified that she began to feel pain after she had been home for a while, went to the emergency room, and went out on worker's compensation leave because of her severe injuries. (Gardner Dep. 73, ECF No. 28-10; Gardner Aff. 3 (¶¶ 19, 24), ECF No. 39). There have been no medical records regarding Gardner's injuries provided.

he was abusive to anyone who cared for him.  Gardner was aware of his behavior before she was assigned to his care, and although she complained about him, she did not ask to be relieved from her duties until after he hit her.

After considering the entirety of the circumstances of this case, and the guidance provided by the cases discussed above, the Court concludes that the line referred to by the *Nexium* court has not been crossed.  CLC did not create a work environment that was objectively hostile or abusive.[2]  CLC is entitled to summary judgment on this claim.

## II.  Race and Gender Discrimination

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  "In the context of Title VII litigation, we recognize two types of discrimination claims: disparate treatment and disparate impact."  *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).  "Disparate treatment refers to deliberate discrimination in the terms or conditions of employment, . . . on account of race, national origin, or gender."  *Id*.  Plaintiff's claim here is one of disparate treatment, which means she must show that the protected trait actually motivated CLC's decision.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 141 (2000).

*a.  Direct Evidence of Discrimination*

---

[2] The fifth element of a hostile working environment claim, whether CLC responded appropriately to complaints about J.S., "is immaterial unless the harassment . . . is legally actionable."  *Nexion*, 199 F. App'x at *1 n.3.

Gardner asserts she has direct evidence of discrimination, because CLC admits that Gardner's termination was based on her refusal to treat J.S.  Gardner contends that her refusal to be subjected to sexual assault was an improper criterion for her termination.   Gardner argues that by terminating her, CLC "was explicitly telling all female employees 'to endure repeated sexual assaults as essential part of the job.'"  (Pl. Resp. Mem. 11, ECF No. 35).

Even if this was an improper reason to terminate Gardner, it is not direct evidence that Gardner was terminated because of her race or gender.  "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993).  If Gardner was terminated for refusing to be subjected to sexual assault, that does not prove that she was terminated because of her race or gender.

> b.  *Prima Facie Case*

Without direct evidence, Gardner must establish a claim of racial or gender discrimination under the *McDonnell Douglas* framework, and first make out a prima facie case of discrimination.  *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512-14 (5th Cir. 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This requires Gardner to demonstrate that (1) she is a member of a protected group; (2) she was qualified for the position at issue; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than a similarly situated employee outside of her protected group under nearly identical circumstances.  *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir.

2009); *Okoye*, 245 F.3d at 512-14.  The parties assume that the first three elements of a prima facie case are met and only address the fourth.

For Gardner to establish that she was treated less favorably than a similarly situated employee outside of her protected group under nearly identical circumstances, she must show that differences between her conduct and that of her proffered comparator did not account for the differential treatment they received. *Ratliff v. Advisors Asset Mgmt., Inc.*, 660 F. App'x 290, 292 (5th Cir. 2016) (citations omitted).  "This requires proof that the proffered comparator shares, among other things, essentially the same discipline or complaint history."  *Id*.

Gardner asserts that she was treated differently than a white female nurse. "In that situation, G.L., a black male resident, was escorted from the facility by police when he cussed at a white female nurse."  (Pl. Resp. Mem. 15, ECF No. 35). Gardner contends she was treated differently because the black male resident was removed when he verbally abused the white nurse, whereas J.S. was not removed when he physically and verbally abused her.

Gardner does not show that she has a valid comparator, as she does not contend that the white nurse was disciplined for the same infractions: i.e. insubordination, refusing to treat the resident, and abusing the resident.  The facility's differing response to the behavior of two residents does not show that another employee acted just like Gardner but was not terminated.  For this reason, Gardner does not establish the fourth element of her prima facie discrimination case.

### c.   CLC's Legitimate Nondiscriminatory Reason

If Gardner had established a prima facie case of race or gender

discrimination, CLC would be required to rebut this case by producing a legitimate,

nondiscriminatory reason for its actions.  *Okoye*, 245 F.3d at 513.  According to

CLC, Gardner was terminated because its investigation of the J.S. incident resulted

in findings that Gardner "was insubordinate, she was refusing to perform patient

care.  By cursing in front of the resident she was also not providing – she was

violating his resident rights.  And quite frankly, she swung over his head."  (Def.

Mot. Ex. I 76, ECF No. 28-9).  These are legitimate reasons for Gardner's

termination.  *See Deanes v. N. Miss. State Hosp.*, 543 F. App'x 366, 369 (5th Cir.

2013) (patient abuse was legitimate nondiscriminatory reason for termination of

nurse); *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167-168

(5th Cir. 1999) (failure of a subordinate to follow the direct order of a supervisor

was a legitimate nondiscriminatory reason for discharging that employee).

### d.   Pretext

CLC could have met its burden to articulate a legitimate, nondiscriminatory

reason for terminating Gardner.  The burden therefore would have shifted to

Gardner to establish that CLC's reasons are not the true basis for the adverse

employment action, but are instead a pretext.  *Bennett v. Consol. Gravity Drainage*

*Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016).

Gardner argues that there is no competent summary judgment evidence that

she took any action in violation of the resident's rights, and her notice of

termination does not mention that she took a swing at J.S.  (Pl. Resp. Mem. 18,

ECF No. 35).  The evidence includes a summary of Brandy Gregg's investigation of

the J.S. incident, which she undertook after a complaint from Toche.  (Def. Ex. E 3-

5, ECF No. 28-5).  Gregg obtained witness statements and notes from Watkins and

Toche, and interviewed Gardner.  (*Id.* at 1-3, 6-7).  Gardner's notice of separation

does not explicitly state that she tried to hit J.S., but cites violation of two residents'

rights provisions of the facility code of conduct as the basis for her termination.[3]

(Def. Ex. F, ECF No. 28-6).

When an employer discharges an employee based on the complaint of another

employee, "the issue is not the truth or falsity of the allegation, but whether the

employer reasonably believed the [complaining] employee's allegation and acted on

it in good faith." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th

Cir. 2010). *See also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (5th

Cir. 2007) (the inquiry is whether the employer made a reasonably informed and

considered decision before taking the complained-of action).  Brandy Gregg solicited

information from all witnesses, and CLC was justified in believing employee reports

that Gardner had swung her fist over J.S.'s head and was insubordinate.  Gardner's

own opinion of her conduct, whether true or not, cannot defeat the imposition of

---

[3]

  The "findings" portion of the notice states that Gardner

> was found in violation of facility Code of Conduct #2qq; (Violation of
> any Residents Rights) and Residents Right #11 (Resident has the right
> to receive adequate and appropriate health care, medical treatment
> and protective support services) and Residents Right #12; (Resident
> has the right to be treated at all times courteously, fairly, and with the
> fullest measure of dignity).

(Def. Ex. F, ECF No. 28-6).

summary judgment.  *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."); *see also Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).  Accordingly, even if Gardner had established a prima facie case of race or gender discrimination, she would have failed to show that CLC's reasons for terminating her were a pretext for discrimination.

## III.  Retaliation

A Title VII  retaliation claim has three elements: (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action.  *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 705 (5th Cir. 1997).  In order to prevail on a claim of retaliation under Title VII, the plaintiff must establish that a retaliatory motive was the Abut-for@ cause of the adverse action at issue.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Gardner argues she was terminated in retaliation for opposing CLC's refusal to intervene in the hostile work environment created by J.S.  The evidence shows that Gardner was terminated because she was insubordinate by refusing to care for J.S., and swung her fist above J.S.'s head, in violation of CLC's work rules.  Gardner has provided no evidence of pretext from which a reasonable juror could infer that retaliation for protected activity was the true reason.  Therefore, her retaliation claim fails.

**IV.  State Law Claims**

Gardner concedes her state law claim of assault and her claim under *McArn v. Allied Bruce-Terminix Company*, 626 So. 2d 603 (Miss. 1993).  (Pl. Resp. Mem. 22, ECF No. 35).  However, she does not concede her claims of negligent and intentional infliction of emotional distress, negligence, gross negligence, and negligent supervision.  She argues that CLC's actions were both intentional -- "[t]his case involves an employer who forced its employees to be assaulted, battered, and groped, or lose their job" – and negligent, in that CLC failed to adequately supervise J.S. "and take any action to prevent him from assaulting Gardner or any other employee."  (Pl. Resp. Mem. 22, ECF No. 35).

> a.   *Intentional Infliction of Emotional Distress*

CLC first argues that Gardner's intentional infliction of emotional distress claim is barred by the one year statute of limitations in Miss. Code § 15-1-35.  *See, e.g., Lynch v. Lib. Mut. Ins. Co.*, 909 So. 2d 1289, 1292 (Miss. Ct. App. 2005) ("[D]eliberate rather than negligent acts . . . fall within the one year statute of limitations for intentional torts."); *see also Jones v. Fluor Daniel Servs. Corp.*, 32 So. 3d 417, 423 (Miss. 2010) ("[T]he tort of intentional infliction of emotional distress . . . carries a one-year statute of limitations.").  CLC asserts that Gardner's claim is premised on her treatment up to and including the day of the J.S. incident, October 6, 2014, and that date was more than one year prior to the filing of the Complaint on December 28, 2015.  Gardner states however, that "Defendant's final act which gave rise to Gardner's claims occurred on March 5, 2016 when Gardner was notified by the Defendant that she was being terminated for refusing to care for J.S."  (Pl.

Resp. Mem. 22, ECF No. 35).  Because this date is within one year of the filing of the Complaint, the claim is not wholly barred by the statute of limitations.

Under Mississippi law, the standard for a claim of intentional infliction of emotional distress is very high.  It requires a showing that: (1) the defendant "acted willfully or wantonly" towards the plaintiff; (2) the defendant's acts are ones "which evoke outrage or revulsion in civilized society;" (3) the acts were "directed at or intended to cause harm" to the plaintiff; (4) the plaintiff suffered severe emotional distress as a direct result of the acts; and (5) such emotional distress was foreseeable.  *J.R. ex rel. R.R. v. Malley*, 62 So. 3d 902, 906-07 (Miss. Ct. App. 2011) (citation omitted).  With regard to the second element, "the conduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Brown v. Inter-City Fed. Bank for Sav.*, 738 So. 2d 262, 264 (Miss. Ct. App. 1999) (internal quotation marks omitted).  Liability does not extend to "mere insults, indignities, threats, annoyances, or petty oppressions."  *Raiola v. Chevron U.S.A. Inc.*, 872 So. 2d 79, 85 (Miss. Ct. App. 2004).

The behavior Gardner alleges caused her emotional distress was CLC requiring her to continue to care for a male patient who had assaulted, battered and groped her, or be fired.  (Pl. Resp. Mem. 22, ECF No. 35).  In the Court's view, this conduct is not utterly intolerable in a civilized society, since Gardner was hired to do the work necessary to care for patients who cannot conform their behavior to the standards of civilized society.  Although her work situation clearly caused Gardner distress, she has failed to provide any evidence that CLC intentionally or

24

maliciously acted against her in a repugnant way.  Accordingly, CLC is entitled to summary judgment on this claim.

        b. *Negligence*

Gardner brought four claims of negligence in this case: 1) negligence; 2) gross negligence; 3) negligent failure to supervise; and 4) negligent infliction of emotional distress.  CLC argues that these claims should be dismissed because Gardner has not produced any evidence supporting negligence.  The Court finds they should be dismissed because they are barred by the exclusivity provision of Mississippi Workers' Compensation Act.[4]

The Mississippi Workers' Compensation Act, Miss. Code Ann. § 71–3–9, *et seq.,* bars an employee's tort claim against an employer grounded in a negligence theory. *Renick v. Nat'l Audubon Soc., Inc.*, No. 3:07-CV-68-SAA, 2009 WL 377288, at *6 (N.D. Miss. Feb. 12, 2009)  "Construing Mississippi state law, our federal courts have been universal on this point."  *McNeil v. Quality Logistics Sys., Inc.*, No. 3:15-CV-927-CWR-FKB, 2016 WL 6999483, at *4 (S.D. Miss. Nov. 30, 2016).  *See also Canaski v. Mid Miss. Prop., Inc.*, No. 1:15CV344-HSO-JCG, 2017 WL 188141, at *2 (S.D. Miss. Jan. 17, 2017); *Tisdale v. New Palace Casino*, No. 1:11-CV-166-HSO-JMR, 2011 WL 5833695, at *3 (S.D. Miss. 2011) (negligence claims are foreclosed as a matter of law by the Mississippi Workers' Compensation Act).  As Gardner is barred from bringing any negligence claim against her employer as a matter of law, these four negligence claims will be dismissed.

---

[4]  The Court may raise this issue *sua sponte*, as it is "purely one of law."  *See Island Park, LLC v. CSX Transp.*, 559 F.3d 96,100-01 (2d Cir. 2009).

**IT IS THEREFORE ORDERED AND ADJUDGED** that the plaintiff's Motion to Strike Affidavit [32] and Testimony [34] of Brandy Gregg are **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that the defendant's Motion [45] to Strike Affidavit of Kymberli Gardner is **GRANTED IN PART AND DENIED IN PART** as set out above.

**IT IS FURTHER ORDERED AND ADJUDGED** that the defendant's Motion [28] for Summary Judgment is **GRANTED**.  Plaintiff's claims are **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 6th day of February, 2017.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE